UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BOBBY JEAN McNEAL,

        Plaintiff,                      1:05-CV-01039
                                                    (NAM/RFT)

        v.

NATIONAL RAILROAD PASSENGER CORP.,

        Defendant.
_____

**APPEARANCES**                                      **OF COUNSEL:**

JOSEPH J. CAPPELLI & ASSOCIATES        Shawn M. Sassaman, Esq.
Eight Tower Bridge, Suite 1090
161 Washington Street
Conshohcken, Pennsylvania 19428
*Attorneys for Plaintiff*

LANDMAN CORSI BALLAINE & FORD, P.C.   John A. Bonventre, Esq.
One Gateway Center, Fourth Floor
Newark, New Jersey 07102-5311
*Attorneys for Defendants*

**Norman A. Mordue, Chief U.S. District Judge**:

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

      Plaintiff was employed by the defendant railroad company ("Amtrak") and has sued pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, for an alleged work-related injury. Defendant has moved for summary judgment on the ground that there is no evidence that Amtrak breached its duty to provide her with a safe place to work. Plaintiff opposes defendant's motion.

**II.    FACTUAL BACKGROUND**

The relevant facts in this case are as follows: Plaintiff began working for Amtrak in 1990 as a ticket agent. As a ticket agent, plaintiff's work consisted of "doing ticketing, baggage, assisting customers, [and] cleaning up at night." After 90 days with the company, plaintiff changed jobs and began working as a coach cleaner. As a coach cleaner, plaintiff testified that she performed the following activities in furtherance of her duties:

> Vacuum the trains, cleaning the vestibules, cleaning the seat trays, emptying the ashtrays, cleaning out the bathrooms . . . washing the exterior of the train, cleaning the buff, the food car, cleaning off the steps, cleaning out the engine room, pulling trash, restocking everything . . . dusting and cleaning the window[s].

In the course of cleaning cars, she had to carry a vaccum which she thought weighed "five to seven pounds," a bucket of soapy water which was approximately 12 inches high and 10 inches in circumference. Plaintiff also carried trash bags full of garbage which weighed anywhere from "five to ten pounds."

In 1999, plaintiff changed jobs to work as a carman. As a carman, she worked on the exteriors and interiors of train cars. Plaintiff described her exterior duties as follows:

> I was running carman. I would be a pitman, change brake shoes and inspections. I put inspections, so you would have to change the brake shoes, whatever is broken under there - if anything was broken, a main reservoir or whatever, you would have to fix it. Making sure that everything was running correctly. Again, it was inspection. And sometimes we would have to cut a car out or cut a car in and we would have to pull the 480 cables and put them back on.
>
> . . .
>
> If something was wrong with a car and you couldn't use it, you would have to cut it out. if they needed to add one or put one in between, you'd have to cut a car in. . . . You'd have to, again, put the cables in or take them out, inspect the car, pull the pin for the car to get connected to the other part of the train, and pull the pin again for it to take it away, make sure everything was running correctly on the train inside and out.

2

Insofar as her interior duties, plaintiff testified as follows:

> Interiors is you got to make sure all the doors are working, the steps are all working, check the fire extinguishers, check the luggage racks, check all bi-parting doors. . . . Make sure everything is in its place. If a C-tray or a seat or anything was broken, you'd have to fix it. Make sure all hammers were in place. Well, big sledgehammers, yes. They are to stay on the train at all times in case like there's a storm or something, you want to be able to get near it and a crow bar also. . . . Dumping the crappers, the bathrooms. . . . [Y]ou would have to pull the top off the bathroom and look, go in there, put a hose it and get off the train and stand on this thing. Its like a step thing with three or four step ladders on it. It was iron. And put the hose underneath and pull the lever to let the stuff come out, the liquids out of the toilets. And then you count up to I think it was 35, and put the water back in and put the seat back on the toilet afterwards.

During the winter months, if plaintiff was assigned to 'interiors," she also had to ensure the train steps were clear of snow and ice using "shovels or whatever" to clean them off. Occasionally, there were other jobs for plaintiff to do as a carman including replacing train windows, windshields and windshield wipers and changing engine flood lights.

Between 1995 and 2000, plaintiff missed approximately three years of work for: 1) injuries related to her job for which she filed two FELA actions against Amtrak; and 2) two unrelated medical conditions. On July 18, 2000, at age 48, plaintiff underwent surgical reversal of a tubal ligation. Two months later, plaintiff saw her primary care physician, Dr. Dhanyamraju, and complained of lower abdominal pain. Dr. Dhanyamraju's 9/23/00 office note[1] states that plaintiff was advised to go to the emergency room at Memorial Hospital for evaluation of her

---

[1] The Court notes that none of the medical records submitted in connection with the present motion are in admissible form, *see* Fed. R. Civ. P. 56(e), since they are neither certified nor accompanied by an affidavit from the various physicians. However, neither party has raised an objection to the Court's consideration of these records in the context of the present motion.

3

abdominal pain. There is no indication in the record of whether plaintiff did so. On February 21, 2002, plaintiff again saw Dr. Dhanyamraju and complained of right lower abdominal pain and a large mass in the same area which had grown larger over the previous months. Upon examination, Dr. Dhanyamraju noted a large ventral hernia in the right lower quadrant of plaintiff's abdomen. He recommended that plaintiff go immediately to the emergency room for evaluation and treatment.

On February 27, 2002, plaintiff underwent surgical repair of a "large incisional hernia" with Composix mesh by Barbara Brazis, D.O.. During the surgery, Dr. Brazis "reopened" the transverse (Pfannenstiel) incision from plaintiff's previous open abdominal surgery. Upon dissecting down to the fascia, Dr. Brazis observed a "large hernia sac at the right lateral aspect of the incision." Dr. Brazis encountered "many adhesions" in "freeing the small bowel from the incision and the hernia sac." In the course of repairing the hernia, Dr. Brazis perforated plaintiff's bowel. Subsequently, on March 12, 2002, Dr. Brazis resected plaintiff's small bowel, removed infected surgical mesh and drained an intra-abdominal abscess. Plaintiff later sued Dr. Brazis for medical malpractice as a result of the bowel perforation which led to various infectious complications.

A little over one year later, plaintiff was referred by Dr. Dhanyamraju to Dr. Isenberg, a surgeon, for "chronic pain" associated with her abdominal surgery incision. In a letter to Dr. Dhanyamraju dated March 20, 2003, Dr. Isenberg noted that plaintiff underwent a "tubal ligation" and more recently an "open tubal reversal three years ago." In a letter to Dr. Dhanyamraju dated August 5, 2003, regarding a follow-up visit, Dr. Isenberg concluded "[t]his incision resulted in and[sic] incisional hernia." Based on review of her abdominal CAT scan, which showed "inflammatory changes in the region of this incision," Dr. Isenberg "suspect[ed]" plaintiff had a

hernia. Dr. Isenberg recommended that he perform surgery to repair the hernia and plaintiff agreed. Plaintiff underwent surgery for repair of a recurrent incisional hernia on September 8, 2003.

There are no additional medical records in evidence concerning plaintiff's care or treatment after the surgery by Dr. Isenberg on September 8, 2003. In opposition to defendant's motion, however, plaintiff submitted a letter from Hany Abdel, D.O., plaintiff's medical causation expert, who recounted additional portions of plaintiff's medical history. Since no party has objected to his factual recitation, the Court presumes it is correct. According to the history stated by Dr. Abdel, plaintiff saw an infectious disease specialist after the September 2003, surgery who diagnosed her with "an infected mesh." On July 14, 2004, Dr. Brian Valerian performed an exploratory laproscopy on plaintiff to remove the infected mesh from her September 2003, hernia repair. In December 2004, plaintiff returned to work even though she testified that the "Amtrak doctor" who examined her for her "back to work physical" said she should not yet go back to work due to the pain she was still having in her abdominal region. When she returned to work in December 2004, it appears that she was "demoted" to the position of coach cleaner "because of cutbacks."

In January 2005, Dr. Valerian discovered that plaintiff had another incisional hernia, this one at the "superior aspect of the midline incision extending all the way down to the level of the umbilicus." In March 2005, Dr. Valerian, along with Dr. Joshua King, a plastic surgeon, repaired the midline ventral hernia. Plaintiff alleges that her recurring incisional hernia condition was caused by the negligence of the defendant railroad in providing her with an unsafe place to work. Specifically, in sworn answers to interrogatories, plaintiff stated that her "condition occurred over the course of time due to the exposure to repetitive micro-trauma." Further, plaintiff averred that

5

she "[could]not pinpoint the distinct condition which caused her injury due to the fact that the underlying causation was cumulative trauma." However, plaintiff affirmed she would "supply Defendant with an ergonomic report which will outline the stressors that Plaintiff was exposed to and that may be considered as causation for her injuries."

In response to the question of what she thought caused her injury or condition, plaintiff answered as follows:

> Not enough help. I believe Amtrak is very understaffed, and I believe that the train should be modernized. I think they should be updated. . . . For one thing, like especially in the winter when doing the steps they should have some kind of device or something, a heater or something, to help melt it instead of you, as a person, with shovels trying to lift all this up. And I believe if they had something like say something was wet or something, get heat on it and it would melt it automatically, you wouldn't have to go through the hassle of trying to use so much labor of make it work correctly because you're doing it yourself. I mean there's been so many times, I got some papers at home, about five accident reports, why I fell and broken my freaking neck and never even put in a claim. Pictures of all black and blue, trying to do it all. It just needs updating. That's all. . . . And even when you were dumping the train, that whole pipe is - they should have some kind of a device there. You have to take the hammer and you got to beat that hose to fit the fitting on just to make it work and then dig underneath there and another little hole to pull the lever down for it to come out, and then your toilets are frozen. I think it just should be modernized. Some should be updated.

According to plaintiff, lack of staffing was a chief problem:

> Because if they had enough help, one person wouldn't have to do everything. Again, pulling cables when you cut out, cut in a train, you have two carmen, one on one side and one on the other one, again, everything is frozen. And if you had like maybe two people, one person can beat that ice off there and knock the lock off the - yank that thing or to beat it back in, I think it would be much safer for a lot of people, including men. Men get hernias from all that pulling and stuff. I mean, it should just be updated.

However, when asked about which of her coworkers had developed hernias, she "[did no]t

6

know." Then plaintiff added, "[o]ffhand [she] heard that, he's a carman, [she] believe[d] his name is Vince Farrell." Plaintiff testified that she "heard he was out with a hernia repair, pretty bad one."

When questioned on whether she had complained about her work conditions to anyone at Amtrak and who she had complained to, plaintiff testified:

> Supervisors I say something to when I'm - I can't remember who offhand. It all depends on who was there at the time. . . . Something like if it was a bad snow day or something and I was interiors and I have to open all 20 of those doors by myself. And I take the crowbar and I try it, I pull the machine out and I try to use this little hot thing that gets stains out and I say, Jesus Christ, can't we even get some help around here. . . . And I say somebody should help, but its your job. They're tired from doing their job, especially on midnights, they don't want to get up and help you. You bid the job, you do it. So you don't complain, you just do it. But me, I would say anything.

When asked who had told her to "just do her job," plaintiff said:

> Nobody said it. Its just the way it is. If you bid a job, that's your job. Say she's a stenographer over there, she don't expect you to come over here and help her. I mean like if it's a bad day and everything is frozen down and you would hope being that she's your friend she come over and try to help you.

In response to the question of particular instances where plaintiff complained, she could not recall any times or dates.

> Q:   Which supervisors did you complain to?
> A:   Whoever was on at the time I complained.
> Q:   Can you remember any specific supervisors you complained to?
> A:   I think Mark Grossman, I said something to him. I said something to Tommy. I forget his last name. I said something to Mike Marino or coworkers.
> Q:   Which coworkers did you complain to?
> A:   I said something to, what is his name. I've said something to Phill, I've said something to R.J. Ferrito. Again, it all depends on who's working.
>
> . . .

7

> Q: And what did you complain about besides using a crowbar and the steamer to open doors?
> A: That we needed more help.
> Q: Anything else?
> A: Not that I can think of offhand.
> Q: Did you ever make any written complaints?
> A: No.
> Q: When did you make these complaints to your coworkers and supervisors?
> A: When it was a bit much. The only time I really was peed off about the situation is in the wintertime. Summertime you can almost handle it. It's a lot better. But when it comes to wintertime you definitely need more help, and that's the only time I really mouthed off.

When asked what year she thought theses complaints were made, plaintiff thought it was sometime between 2000 and 2002.

In opposition to defendant's motion for summary judgment, plaintiff has not submitted any expert proof on the issue of ergonomics or safety. She did, however, submit an unsworn, uncertified letter from a physician named Hany F. Abdel, D.O. to her attorney. Dr. Abdel's opinion concerning the cause of plaintiff's hernia condition is as follows:

> Ms. McNeal worked as a carman for Amtrack[sic]. As you are aware, this type of job is quite strenuous on any one. She relayed to me that she was required to change break shoes on the cars and perform running repairs. Bobby describes them as light repairs; however, many involve heavy lifting like changing and/or fixing windows and doors. Also, there was repair of the exterior, as well as the interior, of cars. Furthermore, she relayed to me that "adding and removing cars from the train involved very heavy labor."
>
> Females usually have smaller body statures[sic] with less muscle mass as compared to their male co-workers. The constant bending, lifting, and carrying can put anyone at risk for acquiring a hernia. There are several types of hernias that can effect the abdominal wall; inguinal, ventral, umbilical, and sports hernias. Furthermore, dark skinned individuals tend to form scar tissue to a much greater extent than a white individual. On the outside of the surgical site, African Americans usually form keloids, and that can give you an idea of how much scar tissue is below that area.

8

> I had a chance to examine this very pleasant patient as well. Her vitals were stable. The heart and lung exam was unremarkable. The Neuro exam was within normal limits. The abdominal exam was quite remarkable for mutilple[sic] surgical scar and keloid formations. Her abdomen resembled a road map. She had a difficult time getting on and off the exam table, as the abdomen is the major "connecting bridge" between our upper and lower body. Her pain and discomfort were real, as I took her pulse during and after her getting on the table, and it was quite elevated.
>
> It is quite apparent that Ms. McNeal was more susceptible than the average individual to hernias due to her prior surgeries, it is my medical opinion that her job duties substantially contributed to the strain put on the weakened abdominal wall thereby causing a protrusion of the visceral contents.

Defendant contends that it is entitled to judgment as a matter of law since plaintiff has failed to adduce any expert proof concerning her claim that her workplace was unsafe. Plaintiff argues that she herself identified the unsafe working conditions which caused her injury and additional expert proof is not required. Plaintiff avers that based on her testimony and the letter from Dr. Abdel there exist questions of fact concerning whether she was provided with appropriate manpower, tools and equipment to safely perform her job.

**III.    DISCUSSION**

A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine

9

issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.

Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d Cir. 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d Cir. 243, 249 (2d Cir. 1985). It is with these considerations in mind that the Court addresses defendant's motion for summary judgment.

B.      <u>Relevant Legal Standard</u>

FELA provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. When Congress enacted FELA in 1908, its "attention was focused primarily upon injuries and death resulting from accidents on interstate railroads." *Urie v. Thompson*, 337 U.S. 163, 181 (1949). Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the "human overhead" of doing business from employees to their employers. *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 58 (1943). In order to further FELA's humanitarian purposes, Congress "did away with several common-law tort defenses that had effectively barred recovery by injured workers." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994). Consequently, courts have "liberally construed" FELA to further Congress'

10

remedial goal. *Id.* For example, the Court held in *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957), that "a relaxed standard of causation applies under FELA." To wit, the Court stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.* Under FELA, "the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff." *Syverson v. Consol. Rail Corp*., 19 F.3d 824, 828 (2d Cir. 1994) (citing *Gallick v. Baltimore and O.R.R.*, 372 U.S. 108, 120-21 (1963)).

"That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute." *Gottshall,* 512 U.S. at 543. The Supreme Court has "insisted that FELA 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.'" *Id.* (quoting *Ellis v. Union Pacific R. Co.*, 329 U.S. 649, 653 (1947)). A plaintiff bringing a FELA action must still demonstrate the four common law elements of negligence: duty, breach, foreseeability, and causation. *See Hairston v. Long Island R.R. Co.*, No. 00 Civ. 7208, 2003 WL 21254196, at *5 (S.D.N.Y. 2003) (citing *Sinclair v. Long Island R.R.*, 985 F.2d 74, 77 (2d Cir. 1993) (balance of citations omitted). "A railroad may be liable under FELA for failure to provide a safe workplace 'when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees.' " *Id.* at 826 (quoting *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 84-85 (2d Cir. 1989)). Significantly, the essential element of reasonable foreseeability in FELA actions, requires proof of actual or constructive notice to the employer of the defective condition that caused the injury. *See Gallose,* 878 F.2d at 85 ("The catalyst which ignites [the duty to provide a safe workplace] is knowledge, either actual or constructive.").

Although FELA plaintiffs are entitled to have reasonable inferences drawn in their favor from the facts, they may not survive a motion for summary judgment when the inferences they ask a court to draw are mere possibilities. *See Connors v. Consol. Rail Corp.*, No. 90-CV-464, 1993 WL 169646, at *8 (N.D.N.Y. May 19, 1993) (citing *Gibson v. American Broadcasting Cos. Inc.*, 892 F.2d 1128, 1132 (2d Cir. 1989)).

C.      Plaintiff's Substantive Claims

In presenting or opposing a *prima facie* case of negligence, "[e]ither party may submit as evidence 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits' to support or rebut a summary judgment motion." *Barlow v. Connecticut*, 319 F.Supp.2d 250, 260 (D.Conn. 2004); *see also* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.") "Unsworn statements, letters addressed to litigants, and affidavits composed of hearsay and non-expert opinion evidence do not satisfy Rule 56(e) and must be disregarded." *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, n. 17 (1970).

Presently, plaintiff has submitted no expert evidence that either: 1) defendant subjected her to an unsafe working condition; or 2) that said condition is the proximate cause of her hernia condition. It is well settled that "[e]xpert testimony usually is necessary to establish a causal connection between an injury and its source unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile." *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 89 (2d Cir. 2006) (citation omitted) (question of whether plaintiff's

12

uniform hat caused his skin condition was technical issue that required expert testimony under Rule 702 of Fed. R. Evid.), *see also Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991) (citing *Meiselman v. Crown Heights Hosp.*, 285 N.Y. 389, 396 (1941) (When the determination whether an injury was caused by some event or conduct is "presumed not to be within common knowledge and experience," competent medical opinion evidence is necessary to enable a jury to find requisite causation). When a plaintiff is claiming that a physical injury was caused by an act or omission of the defendant, medical testimony is often required "because the medical effect on the human system of the infliction of injuries is not generally within the sphere of the common knowledge of the lay person." *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) (alleged use of excessive force by court security officer and miscarriage) (citation omitted). In contrast, where the causal relationship between the defendant's act and the injury suffered by the plaintiff is within the knowledge, experience and observation of a lay person, expert testimony is not required. *See Ulfik v. Metro-N. Commuter R.R.*, 77 F.3d 54, 59-60 (2d Cir. 1996) (breathing paint fumes and dizziness); *Lanpont v. Savvas Cab Corp.*, 664 N.Y.S.2d 285, 288 (N.Y. 1st Dep't 1997) (impact of car and fractured knee); *Jimenez v. Supermarket Service Corp.*, 2002 WL 662135, *4 (S.D.N.Y. April 22, 2002) (whether movement of plaintiff's body during collision as she described could have caused cervical and lumbar injuries was issue which could not be decided without the aid of expert testimony).

In this case, plaintiff claims that something about the manner that she was required to do her job was dangerous or unsafe and caused her to develop an incisional or surgical hernia. The Court concludes that the connection between a surgical hernia and plaintiff's work on the railroad is not of a kind that would be obvious to laymen and that expert proof of causation is therefore necessary. The letter she has submitted from Dr. Abdel to her counsel is not in admissible form and cannot be considered by the Court. *See* Fed. R. Civ. P. 56(e); *Douglas v. Victor Capital*

*Group*, 21 F.Supp.2d 379, 391-92 (S.D.N.Y. 1998) (unsworn letters from physicians generally are inadmissible hearsay and an insufficient basis for opposing motion for summary judgment); *see also United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir.1996) ("[T]he submission of [an] unsworn letter was an inappropriate response to the ... motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.").

Moreover, even if the Court accepted Dr. Abdel's unsworn opinion, it is replete with conclusory remarks concerning the "body statures[sic]" of females versus males and the proclivity of African Americans to develop keloids and scar tissue. Indeed, Dr. Abdel does not even state the relevance of body stature, scar tissue or keloid formation to plaintiff's condition in this case. Although Dr. Abdel states that plaintiff's job was strenuous, he does not state that it was unsafe or inappropriate for a woman. Moreover, Dr. Abdel merely proffers that "constant bending, lifting, and carrying can put **anyone** at risk of a hernia." (emphasis added). Dr. Abdel states in general terms that "[t]here are several types of hernias that can effect[sic] the abdominal wall," but does not identify how any of plaintiff's particular work activities caused her to develop the incisional hernia at issue herein. Finally, Dr. Abdel merely opined that plaintiff's "job duties," not an unsafe or dangerous work condition, contributed to the abdominal strain which caused her hernia.[2] Even accepting Dr. Abdel's speculative assertion that plaintiff's hernia condition was work-related, however, as referenced above, FELA is "not a workers compensation statute," *Gottshall,* 512 U.S. at 543. Thus, more proof than that an injury may be work-related is

---

[2] Dr. Abdel's conclusory opinion does not exclude or even address the possibility of a non work-related explanation for aggravation of her hernia condition. For example, Dr. Abdel does not state that plaintiff, a mother of eight, was generally sedentary outside of work or that she did not engage in physical activities such as housework, child care, elder care, recreation, or sporting interests which could cause abdominal strain.

14

required.

As a further matter, there is no expert evidence in the record which suggests that plaintiff's normal job duties at Amtrak were dangerous or unsafe or that Amtrak failed to provide plaintiff with the necessary equipment and assistance to perform her job safely. Plaintiff contends that she herself may provide evidence of an unsafe work condition without aid of an expert. However, nowhere in the record does plaintiff delineate the alleged "micro-trauma" which she claims caused her injury or how the alleged micro-trauma is related to any unsafe or dangerous condition in her work. It is apparent from the record that plaintiff does not actually know what caused her hernia condition to develop. Plaintiff testified that she thought Amtrak should have provided her with "more help." She also testified that various aspects of her work on the trains could or should have been "modernized." However, while her testimony established that she found various aspects of her job difficult or strenuous, nowhere does plaintiff identify any specific work activity or responsibility that was unsafe or dangerous.

Nowhere in the record does plaintiff state that she experienced any physical symptoms of abdominal pain or strain while working which could be objectively related to the formation or aggravation of a hernia. Even when plaintiff complained during her deposition of the difficulty associated with "dumping" trains and clearing train steps of ice and snow during the winter months she did not state or claim that she experienced pain, strain or any symptoms of abdominal injury. Since plaintiff does not identify any specific aspect of or activity related to her job as the cause of her injury or symptoms, the Court concludes that her claim may be characterized as one which merely insists that the job itself was allegedly unsafe or hazardous. However, there is simply no proof of this broad contention in the record. That plaintiff's job might have been **easier** with use of updated equipment and more manpower is not dispositive of whether it was unsafe or dangerous for Amtrak to expect her to do her job without such help.

15

Moreover, even if plaintiff had specifically identified the aspect or condition of her work which was unsafe or dangerous, there is no evidence in the record that Amtrak was aware of the alleged hazard. Indeed, the "touchstone of this negligence inquiry [under FELA] is the issue of foreseeability - whether or not [the railroad] knew or should have known of the potential hazard." *Ulfik,* 77 F. 3d at 58 (citations omitted). Plaintiff testimony that she said things like "Jesus Christ, can't we even get some help around here" to unidentified persons at Amtrak is hardly proof of notice anyone of a defective or unsafe work environment. Plaintiff's claim that she "said something" along the line of "we need[] more help," to one supervisor and some coworkers does not establish that Amtrak knew or should have known it was subjecting its employees to a dangerous condition which could cause a hernia. Moreover, there is no evidence in the record that other railroad workers in plaintiff's position experienced "micro-trauma" or hernias due to unsafe or dangerous work conditions.[3] That plaintiff's supervisor knew she had a painful hernia in 2002 and would be undergoing surgery is not evidence that Mark Gossman or anyone else at Amtrak knew that plaintiff's job was to blame for her injury. The Court disagrees with the argument of plaintiff's counsel who contends that Amtrak knew plaintiff's job was unsafe because its own doctor advised her to not to return to work in December 2004. To the extent that plaintiff's testimony on this issue established anything it was that plaintiff was still experiencing pain following her surgery in December 2004. There is no rational basis for attributing concern over the safety of plaintiff's job to Amtrak based on its doctor's concern that plaintiff was not physically able to return to work.

In short, there is no evidence before the Court, short of plaintiff's current speculation,

---

[3]

Plaintiff's reference to one individual whom she "heard" had a hernia without actual evidence that "Vince Farrell" is/was a real person employed by Amtrak who developed a hernia due to performing the same work as plaintiff is not persuasive on this point of proof.

16

regarding the cause of her recurrent incisional hernia. Nor, importantly, is there any evidence that plaintiff ever complained to Amtrak about the safety of performing her job duties or that Amtrak had any reason to believe plaintiff's job was hazardous. Plaintiff having stated generally to a supervisor and coworkers that she thought she and her fellow employees "needed more help," is insufficient to demonstrate Amtrak's actual or constructive notice of a hazard. This is particularly true here since in this case, plaintiff has failed to specifically identify the hazardous aspect of her job and claims instead that the job itself was unsafe or dangerous for lack of "modernization." These facts, combined with the absence of any expert proof concerning safety hazards in plaintiff's workplace or the proximate cause of her incisional hernia renders Amtrak immune from any charge of having notice, either actual or constructive, of the alleged dangerous condition which caused plaintiff's injury. Based thereupon, the Court finds that plaintiff has failed to meet even the reduced evidentiary standard afforded personal injury claims under FELA.

**IV.     CONCLUSION**

Based on the foregoing, the Court finds that plaintiff's FELA claim is deficient as a matter of law. Whereupon it is hereby

ORDERED that the motion for summary judgment filed by defendant is GRANTED and the complaint is hereby dismissed with prejudice in its entirety.

IT IS SO ORDERED.

Date: August 15, 2008

_____
Norman A. Mordue
Chief United States District Court Judge